20-1087 et al., the Judge Rotenberg Educational Center, Inc. Petitioner v. United States Food and Drug Administration et al., Mr. Stern for the Petitioners Louis Pompe et al., Mr. Flemming for the Petitioner, the Judge Rotenberg Educational Center, Inc., Mr. Aguilar for the Respondent. Good morning, counsel. Good morning. Mr. Stern, please proceed when you're ready. Thank you. Your Honors, this case involves FDA's total prohibition on using a device long approved by the FDA for the treatment of the most horrific, debilitating, life-threatening, and often catastrophic conditions. The ban applies to a total of 55 persons in the United States. The patients who receive it are those who have proved resistant, the word is refractory, to all other therapies that have seen their health restored, their lives changed, or saved through this treatment. To sustain its about face under the APA and the banning provision of the FDCA, FDA must have considered all important factors, aspects of the problem, specifically based its decision on all available data and information, and provided a reasonable and plausible explanation for reversing a policy on which patients have depended for years. FDA has failed in every one of these respects. First, FDA concedes that there is a population of patients with these conditions who are refractory to all other therapies. To comply with the criteria of the banning statute, it must explain why it now concludes after 30 years of reliance that the risks of the device so outweigh its benefits that it is unreasonable to continue using it even for these persons who have nothing else. Are you now conceding that they can do this at all? I had really thought your base point was under section 396, that they simply could not do what they're doing here, that it's practicing medicine when they base an attempted banning on the use. Am I missing? Have you conceded that point, or are you? Oh, not at all, your honor. I'm going to get to it. Shouldn't that be where we start to examine as to whether they can do it at all or not? Well, I'm happy to start there. I wanted to get this so that I could show how they have not even applied correctly the standards which they admit they have under the banning criteria. Well, if you are correct on 396, then those don't matter, do they? You're right. Absolutely. 396 is really an aspect of how the entire system works. The way the system is supposed to work and the way it did work until this ban was enacted was that the decision as to whether to apply this particular therapy to any particular patient who had tried all other therapies was up to the healthcare practitioner, up to the doctor. That FDA is the gatekeeper for what devices shall be allowed to go into commerce, but it is the medical practitioner that decides what conditions and what patients may get their treatment. Okay. This, of course, we have here a reversal of position. In 1999, Congress passed section 396, which was a statutory form of the off-label doctrine which had existed since 1938, the very inception of this FDCA. Can I ask a question about this part of the argument, which is the interrelationship between 396 and the banning provision? As I understand your position, it would mean that essentially the agency has an all or nothing power in terms of banning. It either has to ban the device in all its uses or it can ban the device in none of them. For now, I'm just going to assume that we're talking about the same device when, for example, this device is used to curtail smoking or is used to curtail self-harm. Let's just assume, I think there's an argument that it's not the same device, but let's just assume it's the same device. As I understand your argument, it's that the agency either has to say that device can't be used for anything or it has to allow the device to be used. My question is, why would Congress have wanted to do that? If it's actually true, I know you dispute it, but if it's actually true that the device is in fact injurious and not at all efficacious for some uses, but is supremely efficacious for other uses, then what's the rationale by which Congress would have said, well, still, the agency's stuck. They either have to allow it for all the uses, even the harmful ones, or they have to disallow it for all the uses, even the effective ones. Well, this is the decision that Congress made. From the beginning, what was carved out was what form of regulation is up to the FDA and what form of regulation is up to the states and is up to the practice of medicine. This was the dividing line, both for drugs and for devices. If there is a device that you have allowed to go into and to be used and to be distributed in commerce, and if it has a proper use, if it has whatever minimum amount of effectiveness or safety that is enough to put it in commerce, we will leave it to the physicians, the hospitals, the experts on individualized retail medicine to decide, is this good for this patient? That doesn't mean that there's no regulation. It just means that it's not up to FDA to make that. I would have thought someone in the case would have cited our decision in American Bar Association versus Federal Trade Commission, where we collected cases where federal government is that have previously been those who have been left in the states and the federal system. Congress should be expected to expressly have said so, or where they not only have expressly not said that they're going into the regulation of practice of medicine as a practice of law, and the other case, practice of medicine, then not only have not expressly said they want the federal government to take over this, but they said not to. They're saying here that practice of medicine is not going to be regulated by the FDA, aren't they? That's correct. It's important to look at the text of the statute. The text of the statute refers specifically, it's 396. It says, notwithstanding anything else in this chapter, and that would include the banning statute. Also important to realize what was the context of the banning statute. The banning statute was not talking about some kind of a device that had previously been approved by the FDA that was supported by some body of scientific evidence that has been used with the approval of the FDA for many years. It was talking about devices that had no arguable claim to validity, the xeric applicator, the beryllium tube, these kinds of things. When the banning statute came out- But do you think that the agency was barred from the use specific ban on powder for the surgical uses? It was banned for surgical uses, but the same powder was not banned for other uses. Do you think that the agency didn't have the power to do that? They banned it for... They banned surgical gloves using- And the powder, but we can talk about the gloves too, but yeah. And examining gloves. They contrasted that with... The contrast was a condom. I think you have to look at... You can say that a surgical glove is different than a condom. I thought that was about the powder. I thought it was about the powder, and the powder is the same as I understand it. That's right, but it's- So then is it your position that the FDA was barred from doing that? No, I'm not. I'm saying that with the FDA... Well, first of all, that never was contested. No, but I'm asking you. Is the upshot of your argument that what the FDA did with the powder, which is to allow it for some uses, but to ban it for others, is something that the FDA lacked authority to do? I think I would take that position if necessary, but I think- No court has ever held that they had that power, has it? That hadn't been tested in the courts, has it? It is distinguishable from the situation- Well, forget the distinction for a moment. Is it not correct that the FDA says they can do that, but no court has ever held that back, has it? That's correct. Okay, thank you. This statute clearly applies to our situation. What the statute says is that nothing in the chapter shall limit or interfere with the authority of a healthcare practitioner to prescribe or administer any legally marketed device for any condition or disease. Now, that was enacted in 1999. On the sentence in the statute too, this section shall not limit any existing authority of the secretary to establish and enforce restrictions on the sale or distribution. That sentence has been there too, right? That's right, but a restriction is not a ban. Isn't a ban a restriction? Well, in- Just in ordinary English, would you say that a ban is a restriction? It could be, but there's a definition of restriction in the FDCA, and it talks about things like there is a restriction here, actually. It has to be prescribed by a doctor. There can be other restrictions. That's what they're talking about when they talk about restrictions. If you construed restriction to mean a ban, then you would be talking about something that- Then the statute would be meaningless at that point, wouldn't it? FDA could do whatever it wanted to. That's right. Congress was specifically concerned with the fact that in 1999, FDA had suggested it could do what it's doing here. That is specifically what caused the- It was suggesting that it could ban a specific use for an approved device. Congress passed this statute in order to prevent FDA from doing that. I think Judge Katz was asking a question. I think your audio cut out for a second. I'm sorry. I'm sorry. On that question, you're putting a lot of weight on the word restrict, a restriction versus a ban. That sentence goes on to talk about sale distribution or labeling. Isn't a perfectly good separate answer to the question that in the context of this statute, which regulates introduction in interstate commerce by people selling drugs and devices on the one hand, but not retail practice of medicine by practitioners on the other, that sale distribution or labeling does not refer to the interactions between doctor and patient. I would agree with that, Your Honor. I think that this is specifically what this statute was enacted in order to what the FDA is doing here to prevent. We have this order. We have this decision from the FDA that goes into that transition discussion. It rather plainly is contemplating the practice of medicine, wouldn't we say? Yes, Your Honor. Absolutely. Note this, that on the very heels of the enactment of the statute, FDA told JRC, you are exempted by the practice of medicine. They told them that for 10 straight years until they started going down this road toward this rule. At that point, they said, we have just learned that it doesn't apply. They didn't explain how it was that they had now reasoned that it does apply. As Judge Santel pointed out, that their interpretation would cause this enormous, uh, give them really limitless discretion to reopen the approval of almost any device. I don't want to unnecessarily cut you off when you're echoing a point that Judge Santel has made for sure, but you do have another colleague on your same side. Let me just make sure that my colleagues don't have any additional questions for you at this time. Nothing further. We don't? Then thank you, Mr. Shurner. Let's hear from Mr. Flammia. Thank you, Your Honors. May it please the court. My name is Michael Flammia, and I represent the Judge Rotenberg Educational Center. I certainly would agree that by banning only two uses of a device used for self-injury, severe self-injury and severe aggression, but specifically saying it can be used for other uses such as smoking, trying to stop smoking or nail biting. This is the practice of medicine. This is the FDA getting involved in the practice of medicine. Smoking itself is a self-injurious behavior. The difficulty in enforcing this illegal use of the ban just raises other problems. The purpose of the banning statute was to take truly hazardous and deceptive devices off the market. It's only been used three times in almost 40 years. It was not promulgated for the purposes of making fine slices of what doctors can do with the device and cannot. And with respect to the powder question, it seemed to me that powder wasn't a component part of those particular gloves, and so the entire device was banned. The GED is clearly not hazardous or deceptive. That would be true. You might be able to deal with powder that way. I'm not sure that works actually, but there's all kinds of examples like the popsicle stick. There's all kinds of examples where the upshot of your position is that it's an all or nothing proposition. It has to be banned even as to efficacious uses. And that may be what you think the statute says, but I think you have to come to terms with your position that that's what it means. Your Honor, the statute was clearly passed by Congress to deal with a very specific issue, and that is the continued marketing to the public of devices that are truly hazardous or deceptive. Again, only been used two other times in history, and there was really no dispute about the hazards and the deception of those devices. In this case, the GED device is not hazardous. It's unpopular. It's unpopular with advocates who don't like powder. I don't really think you're coming to grips with Chief Judge's question on that. Isn't it your position? Isn't it necessarily your position? Oops, I think you may have muted Judge Sentelle. Yeah, Judge Sentelle, I think you're on mute. Just we want to make sure we catch your question. I don't think he's heard you. Judge Sentelle, I think you're muted. Okay, now I got muted. Now I'm unmuted again. I guess I did hit something on my keyboard when I was moving my file around. I don't think you're coming to grips with what the Chief Judge was asking. I think it doesn't have to be your position. Exactly what the Chief is positing, only phrased a little differently, but the FDA is authorized to ban devices, but they're not authorized to interfere in the practice of medicine, and that the banning, the total banning is what they're authorized to do. But as far as the use of them, that's the practice of medicine, and Congress expressly took that out of their power. So you're avoiding saying yes when the issue isn't that your interpretation, but isn't it in fact your interpretation? Yes, it is, Your Honor. In fact, the statute specifically says, quote unquote, banned devices. So yes. Excuse me for talking while I was muted there. I was worried about how hard the question might be, Your Honor. So again, the GED is not hazardous. It's simply unpopular with advocates who don't like the thought of it. But there is no legal basis to ban a device to give the advocates and their sympathizers peace of mind. And to do so would literally rain hell on our clients who are innocent and thriving, and who deserve to keep their life-saving treatment and their only hope for health and happiness. This ban, the FDA's ban, the FDA has completely undermined the legality of this ban with its four major concessions. Number one, first, FDA concedes that severe self-injury and abuse, and I'm quoting the FDA, is a devastating condition that leads to serious permanent bodily injury and repeated physical assaults. Second, FDA concedes that there are patients with severe life-threatening self-injury and abuse who cannot be successfully treated with positive interventions and drugs or any other alternative treatment. So, three, the FDA has conceded that the risk caused by banning ESDs for self-injury and aggression for this refractory population, our petitioners, with no other effective treatment, puts them in the most dangerous risk imaginable, the imminent and inevitable loss of life and limb. And finally, fourth, the evidence of actual side effects of ESDs that FDA identifies in true, and we dispute them, are not serious illness or injury and therefore do not satisfy the banning statute, and they're not comparable to the loss of life and limb, which is the condition our petitioners would be in without ESDs for self-injury and aggression. And to try to save their ill-fated ban, FDA makes a patently arbitrary and capricious and most desperate finding that the GDD, the only ESD currently being used to treat self-injury and aggression and used in only one facility, they claim it provides no benefit at all. FDA makes this baseless claim, giving no consideration to all of the hundreds of decisions and the hundreds of Massachusetts court cases, finding the GED saves lives and causes no harm where all other treatment fails. Further still, the dozens of families of the people currently receiving the GED treatment have all told the FDA in writing that for my child, without the GED, my child will lose her health, will lose her happiness, will lose her freedom, and will return to her previous life of no effective treatment, constant pain and mutilation, blindness, sedation, restraint, and a locked ward and likely early death, no quality of life. Not being able to satisfy the standard of the banning statute, FDA engages in a multitude of other arbitrary and capricious acts to try and justify its predetermined HHS-ordered conclusion to ban ESDs for self-injury and aggression. FDA wrongfully enters the decades-long debate among healthcare practitioners about how to best treat severe self-injury and abuse, but that is practice of medicine, which is statutorily not FDA's jurisdiction. FDA is using a banning statute to tell healthcare, instruct healthcare practitioners that you can use ESDs to treat smoking or nail biting, but not self-injury, FDA is wrongfully playing doctors. FDA uses illegal standards that FDA has never used on any other device, such as the benefit must be durable and curative, and that the need for continuous use of the device means it is not effective at all. Well, what about pacemakers? What about internal defibrillators, knee replacements that mitigate harm just like the GED does? FDA says that only randomized controlled trial research is credible and applicable, not the real-world evidence, single case designs, clinical research, non-clinical data that FDA relies on to clear hundreds of devices. FDA won't even consider the hundreds of peer-reviewed scientific articles approving SkinSharp because the writer might have been biased, might not have reported adverse events, because one of the writers was on the editorial board, all insignificant maybes that could be applied to any scientific literature. And the GED label, which the FDA approved when it cleared GED for treating self-injury in 1994, now suddenly no longer is adequate, despite FDA approving other devices with similar labels that require other types of treatments to be tried first before using the device on a refractory patient, like ECT. There is just no evidence in the record that the current label isn't working, and it is, as you can see from the court findings. FDA won't consider any of the doctors, panel members, judges, parents who have told FDA that the GED treatment is effective, safe, and the only treatment that will keep the refractory patient safe and healthy. Unable to satisfy the banning statute standards, FDA also arbitrarily and capriciously claims that pain is an illness and injury under the statute. Your Honors, pain is a sensation. It is not an illness or an injury. Pain is a very important sensation, because it tells us that we are doing something that is injuring us or could injure us, and we need to stop. For these refractory patients, the petitioners, the pain of severe self-injury and aggression will not stop it. They will engage in hundreds of these behaviors, destroying their body and heart. So, under your argument, your time is about to end, and let me just ask you one last question and just answer this one. Just put aside your argument about uses and devices. We are just talking about a device, and the only thing the device does is cause excruciating pain. Your argument is the FDA is barred from banning that device, because the consequence of it is all it does is cause pain, which is not an injury. It has to weigh the risks and benefits. Yes, pain is not an illness or injury, and pain is involved in hundreds of devices you run. Yeah, okay. All right. I think we have your argument. Make sure my colleagues don't have questions for you. Thank you, Mr. Flamy. Why don't we hear from the government? Mr. Aguilar? Thank you, Your Honor. Daniel Aguilar for the federal respondents. I'd like to just briefly address the arbitrary and capriciousness challenge. Actually, would you mind starting with the statute? We can go straight to the argument about the practice of medicine. So I think that their primary argument is that either under a general exception to the practice of medicine that the FDCA incorporates or in 396 particularly, FDA is prohibited from banning the particular use of a device. I think that's wrong for a couple of different reasons. Initially, both because the FDCA both overall and in 360F recognizes that what a device is depends on its intended use. And secondly, that one is that it's not just that a ban impacts the practice of medicine as this court recognized. I think it was in regenerative medical, right? FDA largely acts in regulating the distribution and manufacturing of drugs and devices and FDA rules with respect to those. Well, that's exactly the problem. That's how the FDA acts. It's in the commerce in the devices and medications and such. And 396 seems to specifically say that's what you're limited to. You can't practice medicine. You can't control the practice of medicine. So why isn't what you've done here today exactly in defiance of Congress's instruction? Because I guess it depends on the interaction that a ban is going to have and then the enforcement provisions, the prohibited acts under the FDCA. So if I could just explain that relationship. So when a device is banned, it's then considered adulterated under section 351G. And then section 331 of the FDCA then says what prohibited acts are. So for example, 331A says you're not allowed to introduce an adulterated device into interstate commerce. So section C says you're not allowed to receive it. Correct me if I'm wrong, but doesn't all of that go to the device, not to the use of the device? So you're trying here not to, man, and the chief has made this point several times with talking to the other lawyers. You're talking about a ban, not of the device, but of the use of the device. Well, a device has to be intended for a particular use, right? So it does. Yes, it does. OK, so it does. It does. Nonetheless, when you have banned the device, you've banned the device. You are trying to regulate its use after it has been transported and sold. You're trying to regulate its use. That use seems to come exactly within 396, doesn't it? Well, no, I don't think so, Your Honor. So for example, if somebody was to manufacture, let's say a company starts up tomorrow to manufacture and distribute these devices and say, right, the only way that we're marketing this, the only way that we're selling this, the only things that we're putting on this label is that this is for using, this device is to use to shock people, to stop self-injurious and aggressive behavior. That would be a banned device. If some other company comes on the market tomorrow and says, the only thing that we're doing, the only thing that we're marketing this for is for smoking cessation or something else, that is not a banned device under that issue. Even if it were precisely the same device. Yes, and that's true generally. What you're regulating is not the device, it's the use of the device. If you are permitting the device to come on the market, the whole transition section of your FDA opinion, the appeal from, seems to be with that in mind, that what we're dealing with here is practice of medicine. No, Your Honor. Generally speaking, when FDA is classifying different medical devices, right, it looks to their intended use. So we give a couple of examples of this. For example, some knee prosthetics, right, are going to be class two when they're used to treat particular arthritic conditions because of the- Nonetheless, when you are talking about what you're regulating here, what you're really going to is not the device, but the use of the device, isn't it? Yes, Your Honor. The identical device could still be legal, but for your regulation of its use. Is that not correct? And that's true generally with devices. If I could just complete the thought, because I think it does go to answer Your Honor's question. So you're saying off-label use does not apply to devices, but only to medications or- No, that's not what we're saying, Your Honor. It sounds like what you're saying. It is not what we're saying. And if I can be clear about this, the prohibited acts in 331, generally speaking, are targeted at manufacturers and distributors, not at a physician's off-label use. And that's what section 396 recognizes. So is that also true? Does ban come with an off-label? So for example, if a healthcare practitioner at petitioner's facility wants to administer this device, can they do that for a device that they already have? It's not newly on the market. It's not newly distributed. It's been in their possession for 40 years.  I think that's going to depend on the particular factual scenarios there, and if I can explain why. Okay. For a device that has been manufactured and distributed already for this intended use, I think it comes within the ban device. For a device that is not- Okay, but it might come within the ban device, but what does that mean in terms of 396? The healthcare practitioner is not able to prescribe or administer that device? So if I can be clear, because there are other cases that could potentially be implicated by how this gets divided. So for example, under 396, general practice of medicine issues, practitioners who have a patient, they have a practitioner-patient relationship, can't prescribe off-label devices, even if it's for something that's not otherwise- Can prescribe, right? Yes, as long as it's an otherwise legally marketed device, yes, they can do that. Now, and I want to be clear because this has potentially outside implications here. When a physician is acting as a manufacturer or distributor, there can be particular consequences. If I can just give one example to explain why. There was a case out of the Ninth Circuit where a doctor was reusing single-use needle guides for biopsies and then distributing that to people in their practice. The Ninth Circuit upheld a criminal conviction for that because it said, when you are using that essentially unsanitary and adulterated device and acting as a distributor to other people for it, that doesn't come within- Let's get out of the hypotheticals and come back to this one that the Chief's asking you about. In this case, could a practitioner at the center prescribe this use, continue to prescribe this use on the devices that they have there? And I think it depends on the particular factual scenario. No, don't tell me it depends on anything. You tell me, is it possible for the doctor to do that first? Then you can explain your answers. I think generally, yes. If it's within a legitimate patient-practitioner relationship and it's otherwise a legally marketed device, yes. Let's take the device we have here, the exact scenario we have here. Don't give me any ifs. Your Honor, the reason that I can't give you a particular answer on that is that this administrative record that we have in this case- Let me ask it this way. I think we have to understand exactly how 396 potentially inhibits people at the facility from using devices that are already there. I'm not talking about distribution to another doctor. I'm not talking about that. You can take that one off the table. All I'm talking about, because as I understand it, that's the complication that's raised by the Ninth Circuit case that you talked about. I'm just talking about a doctor or a healthcare practitioner at the facility who has had this device that they've already had for a long, long time. Can they continue using it with respect to people at the facility as to whom they've already been using it? Then the FDA comes along and says it's a banned device. Right. The particular device I'm talking about is one that's been on the shelf in the facility at the time that the regulations adopted. Can that doctor or the healthcare practitioner- Excuse me. Can the healthcare practitioner continue administering that device in the same way? As long as it's- So the stumbling block that I'm reaching into, and I just don't actually know enough here about, is whether that pre-existing device, because it was manufactured with that particular intended use, as I take it to treat for self-injurious behavior, now qualifies as a banned device. So I'm not sure that it would have another legally marketed purpose for that particular device, given the way it's manufactured. So if I could just change the hypothetical to hopefully give you an answer better. If there's a device that is created and marketed today for a lawful purpose, such as treating smoking cessation, a doctor gets that device and then makes an independent judgment to treat a particular patient- I still have a mantra in the real world. If a doctor at this center has the device and has prescribed it for a patient, can they continue doing so now after the FDA has taken effect? And I think that depends on whether or not- No, no, it doesn't. No, it doesn't. Not in the question we're asking you. There is no outside fact involved here. There is nobody who said there's another use back at the time. We have a real world in which they have these devices that they may have illegally at the time. They have been using them legally all this time to treat a particular condition or prescribed their use for a particular condition. Can they keep on doing so without asking any other questions? Your Honor, I'm trying to give an answer to it and I'm trying to- I don't think you're trying hard enough. Can they keep on doing it? Your Honor, the stumbling block that I'm running into is whether or not that particular device, if it was only marketed initially and distributed- Assume it was only marketed and distributed. Assume it was marketed for the purpose you don't like. Yeah. And that's where I'm coming into on whether or not it would come into like a particular prohibition under 331. Assume it is a banned device. Can they keep on using it if they had it in the past? I think that's going to depend on a particular enforcement action or a seizure action, but generally speaking- Right. It might be- It may be a subject to seizure. I get that. I think your argument would be with any banned device, even if it hasn't been banned before, there's an authority under 334, I think it is, to seize it. I get that, but just even- And that may be controversial, but let's just put that to one side. Suppose there's no seizure. The government doesn't want to seize it. The question is, can the doctor, the healthcare practitioner, continue using the device with respect to patients on site in the same way that they had before? Because if they can, and I never read your brief to say that they can't actually. This is why the question keeps coming up. If they can continue using it that way, well, then it puts a whole new lens on the interrelationship between banning and 396. Because it seems like you've got an answer that says, well, under 396, it actually doesn't inhibit the- it doesn't restrict the practice of medicine in the same way that's been conceived of, because the healthcare practitioner can actually continue using the device in the same way. The ban doesn't inhibit that to the same extent that's been posited here. That's why I think we're trying to suss out an answer to that. What exact effect does 396 have vis-a-vis a device that's now banned on somebody who already possessed the device, has already been using it for a particular purpose? Can that continue to happen? And I think, generally speaking, so long as the device has another lawful- Well, that's the part where you're killing your answer. We don't want to know so long as the device says no. We want to know right now the facts on the world. The real facts are that these doctors have been using this, or these medical practitioners have been using this, not for other purposes. It has no other purpose there, but this. Now, this is the real world. This is not a hypothetical. Can they continue doing what they've been doing, consistent with your ban? And that's why, Your Honor, I'm still trying to give you the correct answer and not make a mistake. You're not going to get an answer by me that has any effect so long as, or has any effect if, we know what the facts are. This is not a hypothetical. Your Honor- Your answer on these facts, or I'm going to take your answer to be no, they can't keep using it. I don't think that that's my answer, Your Honor, and I don't think that you should impute that in here. So, your answer is, yes, they can keep using it? Your Honor, I'm trying to give the correct answer. I think I generally agree with what Chief Judiciary Navassan said, which is that, generally speaking, the off-label prescription of a medical device is permitted, and that's what 396 recognizes. So, in this case, because you started saying, as long as it's got some other use. Now, in this case, with this device, it does have another use, because it can be used for smoking. So, we've already crossed that. So, it sounds to me like the government's position is that, notwithstanding the ban, that for healthcare practitioners who are on-site, they can actually continue using this device in the way that they were using it before. And I think, now, there may be a seizure at the end of the day. That may be an enforcement. There may be some seizure because of the ban, but unless it's been seized, in terms of the devices that are already on-site, those can continue to be used in the same way. I think that that's generally true, and the only hesitation that I was positing is because we haven't briefed this, and that's why I have a hesitation on it, because I haven't nailed it down exactly, is isolating exactly what the lawfully marketed portion of it means here. Because, again, what we've done here in the banning rule is not try to regulate how a particular healthcare practitioner uses a device off-label, but rather state whether these devices used for this purpose present a substantial and unreasonable risk of injury that can't be corrected by labeling. Did you then say that these would be subject to seizure if the center continues to use them for this purpose? I think if the center is distributing them to their doctors for the purpose, for this intended use that is banned and considered adulterated, then, generally speaking, that can lead to a seizure action for an adulterated device. We really do have an issue as to whether or not you're interfering in the practice of medicine in violating the state. No, Your Honor, because, generally speaking, devices and drugs can be considered adulterated, and they're manufactured and distributed can be limited and seized. And this court and others have repeatedly recognized that the fact that a particular practitioner can't access a drug or device, even if they would like to prescribe it, doesn't affect the practice of medicine. Your theory, as I understand it, is that the FDA has discretion to treat different uses as different devices for purposes running throughout the statute, including the ban provision, correct? That's correct, Your Honor. Okay. But for decades, the idea of practice of medicine, the thing that was protected with regard to drugs and with regard to devices was the ability of a physician to take the article, the thing, whether it's the drug or the device, and it's approved for one use, the physician gets to say, I am making a medical judgment to prescribe it for a different use. Now, on your theory, if the FDA has the ability to slice up those uses and say one of them is really a different device and, therefore, it can be banned, there is no practice of medicine that's beyond your authority. No, I don't think so, Your Honor. I think under the concern that you've laid out there is that what the effect of the ban is and the effect of declaring it adulterated for a particular use is whether or not that device, as marketed for that particular use and distributed for that particular use, is widely available in the marketplace. So long as the same physical technology, right, either for the powder in the powder glove example or the electronic... Let's just assume, for the sake of argument, that the ability to seize is enough, right? Put aside the debate over the downstream consequences. Let's assume the consequence of banning is that banning for a use is that the physician can't prescribe for that use. I don't think that would be the consequence of the seizure action. As I understood it, generally speaking, you're looking to the intended use of the manufacturer or the distributor. So the effect of the ban in making this product adulterated when and only when its intended use is for treating these severe issues as opposed to nail biting, the effect of that is the physician can continue using the device, but if he does, then you can come in and seize it. No, and again, that's why I was looking to the manufacturer and distributor's intent. I mean, now you're completely losing me. I mean, these devices have two intended uses. One is treating these disorders, and another is treating smoking and nail biting. And your theory is that you can ban the one use, but not the other use. You can use your section 360F power to ban one use, but not the other use. Yes, and that's exactly what it is. And the consequence of that is that the device becomes adulterated when used for one purpose, but not the other. And that's exactly what we did in the powder gloves rule, right? Was that powder for surgical gloves can present an acute risk of infection, allergic reaction. I don't understand how your answer, let's just focus on the ban. Can the, I'm sorry, the seizure, can the FDA come in and seize devices that this center continues to use for the now prohibited purpose of treating these disorders? I don't know how your answer can be anything other than yes, they can seize the device. And that's why I was trying to distinguish between a distributor and the physician, right? If the center is acting as a distributor, giving out these devices for the intended use of treating self-injurious and aggressive behavior, then yes, I think that that falls within the adulteration and prohibited acts. There's nothing in 334, the seizure authority that draws that distinction. It says if the device is adulterated, it can be seized. So that's why I'm working back because all these provisions interact with each other, right? So 351 defines what's adulterated. And 351G says it's adulterated if it's a banned device. If it's a banned device, it's adulterated. Right. And so what 396 and the general practice of medicine exception recognizes that physicians are permitted to prescribe devices even for off-label uses. And so you generally don't look to the intent of the physician about how the device is going to be used because that falls within practice of medicine. So in this case, if medical professionals at the center continue to use this against the self-destructive behavior, are they going to be subject to seizure because it's becoming an adulterated device by being so used? Based on the practitioner's actions, no. But if the center is acting as a distributor and distributing these devices for a particular purpose that FDA has found causes substantial and unreasonable risks of injury and resulted in their ban and classification as adulterated devices, then the center's actions might give rise to a particular enforcement action. Would you be satisfied, would your client be satisfied in the opinion of this court that says, we're not striking down your ban, but you are not lawfully entitled to go in and seize their devices? Well, I don't think that that would be before the court, but I also think that it would depend on the particular predicate for a seizure action, right? If they got devices... Let's assume that they are not either selling the device or even transferring the device for free to any entity outside the Rothenberg Clinic. Okay, but within the Rothenberg Clinic, the devices are on the shelf. The physicians use them. One physician is treating a patient and can't come in that day and says to a colleague, please do the treatment. Your Honor, would that be distribution? Your Honor, I don't know because this gets into exactly how 331K applies in health for sale. And I know that's a nuanced area. We're not in an enforcement action right now. And if the center or particular doctors want to raise these particular claims, which is what I take the reply briefs mainly to be focused on as defenses in a particular enforcement action, this court or another can encounter that and deal with it and we can brief it fully. But the only thing... You're not excluding the possibility of an enforcement action. Because it depends on the particular consequences as we talked about, about whether the center's acting as a distributor or whether somebody else is. And there are cases in which somebody does act as a distributor and encounters a prohibited act, like you gave the example of, you know, a doctor acting as a distributor for an unsanitary medical device. And, you know, liability can rise there. But we're not in an enforcement context here. The only question that's on the table, as I understand it, in this practice of medicine argument is can FDA promulgate a general rule that's applicable to distributors and manufacturers equally that says this device, when it's intended for this kind of use, presents serious and unreasonable risks of physical and psychological injury that are well-documented through a wealth of evidence that FDA and the expert panel considered. And I think that is within FDA's general ability... That really is the question. But the thing is that it's not just a question of the abstract, because in order to know whether the FDA has the authority to ban it, the FDA has to take account of 396. And so the scope of 396's insulation of healthcare practitioners, notwithstanding the ban, necessarily informs, it seems to me, whether the ban is permissible, because 396 is a statute that's on the books that has to be contended with. Now, it sounds to me that at least, I think, and I appreciate that you can't know every hypothetical and know for sure how it would be handled in an enforcement action. I don't deny the complication of that. But it sounds to me that at least your position is that there are some situations in which, notwithstanding that this device has been banned for disuse, there are at least some situations in which healthcare practitioners at the facility, at the center, can continue using the device for the use that it's been used for to date without running afoul of the law. And I think that goes with the general proposition that off-label use by physicians of an otherwise legally marketed device is covered by the practice of medicine exception. Now, that may be an exception that's exceptionally narrow if it turns out that, you know, even moving your own device from one shelf to another is a self-distribution or something. I mean, at some point, the distribution idea swallows the insulation of the practice of medicine provision, and there may be some permutations there. So can I just follow up on that? I mean, that's a very odd view. I mean, on the front end, your approval of a device is specific for an intended use, right? Yes. And the manufacturer, and it is always the case that if you focus on the manufacturer of the device versus the physicians at Rothenberg, it's always the case that even without any ban, the manufacturers, all that the manufacturers can do is manufacture the device intending that it be used for the approved use and market it for the approved use, right? They can't do anything vis-a-vis the unapproved use. So if your theory of the ban is, well, you're just restricting the manufacturers, but not the doctors in any meaningful way, the ban really isn't doing anything. No, I think the ban is doing something, right? To the extent that a manufacturer distributor is, yeah, we are going to only do these for self-injurious and aggressive behaviors. We think this is great for that. We're going to market this and advocate for its use in that way. That's something that the FDCA generally covers. Or alternatively, if somebody, I guess it would depend on the facts of a particular enforcement action, but if somebody is distributing these with a wink and a nod, understanding back for dealings of like, oh, we're facially saying that it's for this purpose, but everybody knows it's for the ban, adulterated purpose. I think that's where it also has teeth in that scenario. And I mean, again, that's all on the enforcement end of the spectrum. And if the court or anybody else has concerns about general practice of medicine, I think that that's where they're best felt. But FDC, FDCA... It would be best felt at the beginning when you talk about whether you got the ban at all or not. When you're talking about regulating the use, that's regulating the practice of medicine. That's something left to the states. And you should have been... People that object to this thing should have been lobbying Massachusetts instead of the FDA. Your Honor, FDA regularly classifies devices differently based on their intended use, because when you look to the intended use, you recognize that they have different risks and effectiveness. And so for you to give the example... Other than the gloves, what have you banned? So there have only been three bannings. You can label and sell, but you can't... You're talking about labeling. Excuse me. You're talking about labeling and not banning. Generally, aren't you? Or pre-market approval. So class three devices, for instance, necessarily present unreasonable risks of injury, but also have other benefits to them. And that's where you need pre-market approval and particular labeling for them. So in that example... Is the only thing where you've banned a device solely because of its use? So that would be the powder and the powder gloves example. That's the best example you've got. And it's never been to court, has it? Well, Your Honor, FDA has only banned essentially three devices in its history because it's been pretty judicious with this authority. It banned prosthetic hair fibers for insertion into the scalp. It banned the powdered gloves and the powder that goes on... In the pre-market approval context, which is more standard fare than the ban, I know that the ban has been not used very often. The pre-market approval process obviously is used all the time. And on that one, healthcare practitioners still have an insulated zone under 396, notwithstanding a pre-market approval. That's where the off-label use comes into play in full force. Right. So there's some insulating work that 396 is doing. And the question for us is, and for you, is what insulating work is 396 doing in the ban context? Now, I have a broader question for you on this, which is we've been talking now for a long time about how to appropriately construe 396 and how to interrelate 396 with 360F, is it? I don't know if I have the number. Yes. 360F. Why does your brief not cite Chevron? This just seems like what we're doing here is we're just construing these statutes and trying to figure out how they interrelate. And I'm just wondering, does the agency not think that its interpretation of these provisions and the way they interrelate is something as to which it has interpretive authority? I think the FDA definitely has interpretive authority over the FDCA. I, to be honest, I didn't understand this to be a Chevron issue. We've just thought that these always relate to each other in a fairly straightforward fashion. And there might be a- But no, but then, can I just stop you right there? When you say you don't think it's a Chevron issue, I get confused when I hear you then follow up. I say, by saying they interrelate in a straightforward fashion. That still seems to me that you're doing statutory interpretation. You may think the answer's easy, but it still seems to me you're doing statutory interpretation. And if you're doing statutory interpretation with respect to a provision as to which you have interpretive authority, then isn't that Chevron land? I guess the question would be whether we're at Chevron step two yet. No, no, I'm not talking about that. I'm just talking about, are we doing Chevron at all here? Are you doing Chevron at all here? And if you are, it sounds to me like your answer is yes. You just think that it's easy, that you win. So you don't need Chevron. I guess my question is, and maybe I've got that wrong. If I've got that wrong, tell me. But it sounds to me like that's what you're saying. And what I don't understand is if that's where you are, then why wouldn't you just invoke it anyway? As I as I think the department has done for decades when it's have Chevron authority is always argued. Well, I think we went anyway, but Chevron makes it easy because all our interpretation has to be as reasonable. Now, I just want to make sure that I I'm not missing something in thinking that this is a case in which that kind of argument could be made. I we we thought that the case was fairly straightforward enough that we didn't need Chevron. I'm not resisting the application of Chevron here. And then but why? If you think that the case is easy enough that you don't need Chevron, why not use it if it would help you anyway? It doesn't it just make it easier? Your Honor, we think for all the reasons in our brief that this the court can affirm, you know, obviously we're not acting in a way to try to constrain the court's consideration of these issues. But you do think that Chevron court might disagree with you on that. I'm sorry, Your Honor. Did you consider the possibility that a judge might disagree with you on the proposition you just stated? I am considering it now, and that's why I'm saying this is an issue. It's a little late in the day, counsel. Yes, Your Honor. Like I said, we thought that we went on this issue just in a pretty straightforward fashion. One more question for me, which is a proposal to ban said the ban would apply to devices, to ESDs, and now I'm quoting, already in commercial distribution and devices already sold to the ultimate user, as well as devices sold or commercially distributed in the future. Now, given that, isn't it a little bit rich for you to say that if there are any concerns about the practice of medicine don't really apply because the ban is only going to have teeth as applied to the initial sellers, but not as applied to the downstream doctors? No, Your Honor. As we explained, right, you're still in those instances looking to what the intended use was on the distributor and the manufacturer. That's the problem. The device, right? That's the problem. That's the problem. I don't think it is a problem, Your Honor. If you look to it, and we cited this house report in the brief of HR rep number 94-853. It's the Congress report from when they passed the Medical Device Act, and there Congress is clearly saying, we expect that the secretary, when a particular item has different uses, that the secretary can say that that's a different device depending on its different use. And so I don't think it's at all odd for FDA to, when it enacts a banning rule, to say that this applies to the devices that are already in use. It brings us back to your, what I think is your primary defense, which is that the banning authority allows you to pick off individual uses, but it tends to foreclose an alternative defense that this is really no big deal because the consequence of the ban really doesn't impair retail practitioners. If a practitioner wants to access an electrical stimulation device that's been manufactured and marketed for another lawful purpose like smoking cessation, and then make an independent medical judgment that it's going to be best used for my particular patient in a different way, that's something that falls within the general practice of medicine when made in that context. And that's why FDA's general banning rule doesn't run afoul of these concerns. And if this device is banned under the ban we have here, and the doctor does that, does he not run the risk of the enforcement proceeding taking the device? So if the device's intended use has been lawful, right? And I'm just trying to take... It has a lawful use for smoking. We don't have an if here, we have a real case. If he has a device, he's using it for the self-destructive behavior, would he not be subject after doing so to having the enforcement proceeding brought? I don't know what the enforcement proceeding and that hypothetical would be against the doctor. I'm not sure. Right, so it would be against the doctor. I think that is an important distinction because I take it your position is even if the device is subject to seizure, which it may be, that's not an enforcement action against the doctor for anything the doctor... All right, that's fine. I'll take that qualification. That the device would be subject to an enforcement procedure. Yeah, and that was the particular distinction that I was making because as this court and others have recognized, right, the general... It may be a distinction without a difference though, counsel. My question still is, would it not be a possibility of an enforcement proceeding if the doctor continues to use this device for the treatment of self-destructive behavior? If the only intended use of this device... Don't put any ifs in there. This is not a hypothetical. This is a real case. Your Honor... The doctor is using it. I'm trying to be... If the doctor continues to use it, will the doctor stand in the danger of having the seizure procedure? And that's why I'm... I think the answer depends on a particular fact, and that's what I'm trying to delineate here. That's why I used the term possibility instead of saying it would definitely happen. Right, so if the only intended use of this device for the treating self-injury... That's all the doctor's using it for is for self-destructive behavior. You've got that fact on the table. Quit trying to make up a different case. Your Honor, if that was the only purpose, then I think it falls within the general practice of medicine, and you don't look to the adulteration from that. If the intent otherwise is coming from a distributor and a manufacturer, then I think it is subject to the general prohibitions. And before we completely end, can I just... I just want to button one last thing, which is we've got decisions that say that the government's decision not to invoke Chevron doesn't affect a waiver of Chevron, but that presupposes from our purposes that Chevron would otherwise apply had the government invoked it. I just want to make sure you don't have any reason as the government to tell us that Chevron doesn't apply here. I am not here today to tell you that Chevron doesn't apply. Okay, let me make sure my colleagues don't have any additional questions for you. Thanks. Okay, thank you, Mr. Aguilar. Each of the Petitioner's Council, I believe, has one minute for Roboto. We'll give you your one minute. Thank you, Your Honor. First of all, to make it clear what the ban does is, as the passage that Judge Chatzis read from, it clearly bans the use of these devices. And it specifies that for the compliance date is 30 days except for those which are currently being used. And for those, FDA gives JRC and my clients six months. And then it has to end, specifically. That's what the rule says. That's the whole gist of the transition section of the opinion as well, isn't it? Correct. And for that reason, we had to go to FDA and seek a stay. That's the only reason we had to seek a stay on this point. As far as what enforcement they could use, they could use seizure, but it's also a crime to use an adulterated device. And what doctor is going to take that risk that the FDA may give him the pass on using what the FDA... What's the statute that makes it a crime? I don't have it. Is it 331, which says... which describes as a prohibited act the introduction or delivery for introduction into interstate commerce of an adulterated food, drug, or device? There is a separate statute. I do not have the number in mind, which says violation of 331, those prohibited acts of crime. And there are cases which deal with the practice of medicine issue, which arise in the criminal context. I think regenerative sciences might have been one of those cases where there was a criminal prosecution. And I take your point about risk, but it does seem to me you would have a pretty good argument that the center, no matter how it shares and uses and moves around the devices at the center, is not introducing them into interstate commerce. That's true, but the FDA doesn't see itself limited to interstate commerce. And this is a... the obvious intent and purpose of this statute is to end explicitly the use of these devices for this purpose. You don't mean for use of the purpose of the statute, you mean the purpose of the FDA. Yes, correct. Exactly. Now... I'm sure my colleagues don't have any additional questions for you. I did have one further observation to make. You can make it really quickly. Well, I think that what the FDA's theory does is it would create this gaping exception to section 396. And what this court said just last week in the genius case would apply here, which is that, and the court quoted the Supreme Court, you don't generally make fundamental changes with subtle moves. And that's really what they're saying here. That's what we said in the area and nobody cited it back. There's no application of Chevron here. And it's telling that they never raised it. Congress spoke directly to this issue. It doesn't even rise. And if you did get there, this would be a completely unreasonable interpretation. Okay. Thank you, Mr. Stern. Mr. Flamia, we'll give you your one minute rebuttal. Yes. Thank you, your honors. With respect to the criminal statute, use of a adulterated device would subject the healthcare practitioner to up to a year in prison for a first offense. That's at 21 USC section 333A1. Your honor, this is the practice of medicine. That is specifically used as opposed to introduction into interstate commerce? I believe it's used, your honor. Okay. It is the practice of medicine to ban one specific use of device, but allow it for smoking or nail butting. And it's the same, the device would cause the same level of pain. So the statute isn't accomplishing any, the ban, I should say, isn't accomplishing anything, but the FDA would use it because of all these uncertainties against JRC and the healthcare practitioners there to frighten them into not using it because of these potential criminal liabilities and everything else. So that the ban doesn't meet the requirements of the statute. It should not be allowed to stand and it shouldn't also be allowed to harm these petitioners who need this treatment to survive and allow the FDA to harass them and threaten them to stop using the treatment. So your honor- Can I just ask you one question right as we close, which is, and you may not know the answer to this, but does this statutory and regulatory scheme allow for the potential target of an action to seek advisory and advisory opinion on whether the actions that they're going to undertake falls within the zone of what's prohibited? Do you know of anything? No, not to my knowledge. And you know, it's clear in the record, the FDA's treatment of these petitioners has been harassment, unfairness. All they want to do is stop JRC from using this treatment on these clients who need it to survive. And this ban needs to be set aside to protect them. Okay. Thank you, counsel. Thank you to all counsel this morning. We'll take this case under submission.
judges: Srinivasan, Katsas, Sentelle